## United States District Court
## District of Massachusetts

```
_____
                                    )
ACCESS CARDIOSYSTEMS, INC.,         )
                                    )
         Debtor,                    )
                                    )
RANDALL FINCKE,                     )
                                    )
         Appellant-Defendant/       )
         Cross-Appellee-            )
         Defendant                  )        Bankruptcy Appeal No.
                                    )        11-40223-NMG
         v.                         )
                                    )
ACCESS CARDIOSYSTEMS, INC.,         )
NORTH AMERICAN ENTERPRISES,         )
INC., JOHN MORIARTY AND             )
ASSOCIATES, JOHN J. MORIARTY,       )
RICHARD F. CONNOLLY, JR. AND        )
JOSEPH R. ZIMMELL,                  )
                                    )
         Appellees-Plaintiffs/      )
         Cross-Appellants-          )
         Plaintiffs.                )
_____ )
```

### MEMORANDUM & ORDER

**GORTON, J.**


     This bankruptcy appeal arises from a pre-petition suit filed
in the Massachusetts Superior Court by plaintiff-appellants
Access Cardiosystems, Inc. ("Access"), four of its individual
investors, John J. Moriarty ("Moriarty"), James A. Radley
("Radley"), Richard F. Connolly, Jr. ("Connolly") and Joseph R.
Zimmel ("Zimmel") (collectively, "the Investors"), and the

corporate entities through which several of those investments were made, against defendant-appellant Randall Fincke ("Fincke"), a former Access shareholder, officer and director.  The suit asserted, <u>inter alia</u>, violation of the Massachusetts Uniform Securities Act, M.G.L. c. 110A, § 410(a)(2) ("Section 410(a)(2)"), and breach of fiduciary duty to Access.

## I.   <u>Background</u>

In February, 2005, Access filed a voluntary petition seeking relief under Chapter 11 of the United States Bankruptcy Code and the action was subsequently transferred to the United States Bankruptcy Court for the District of Massachusetts.  The Bankruptcy Court ultimately determined that Fincke breached certain of his fiduciary duties to Access and, in one instance, violated Section 410(a)(2).  The plaintiff-appellants sought approximately $20.8 million in damages for Fincke's violation of Section 410(a)(2) but were awarded only $1.5 million and were denied attorneys fees.

Currently before the Court are cross-appeals of that determination.  The appeals were filed, and thus docketed, separately but were consolidated in January, 2012 by order of this Court.  Fincke contests the finding of liability under Section 410(a)(2) and the award of any damages to the plaintiff-appellants.  The plaintiff-appellants, in turn, contest the damages award, which they perceive to be erroneously low, and the

denial of their attorneys fees.

   **A.   Access and its Investors**

   The facts and proceedings of this interminable case have been exhaustively recounted by the Bankruptcy Court on numerous occasions. See, e.g., In re Access Cardiosystems, Inc., 340 B.R. 127 (Bankr. D. Mass. 2006) ("Access I"); In re Access Cardiosystems, Inc., 404 B.R. 593 (Bankr. D. Mass. 2009) ("Access II"); In re Access Cardiosystems, Inc., 438 B.R. 16 (Bankr. D. Mass. 2010) ("Access III"); In re Access Cardiosystems, Inc., 460 B.R. 67, 83-84 (Bkrtcy. D. Mass. 2011) ("Access IV"). Accordingly, the Court will rehearse the facts only as necessary for purposes of the instant appeal.

   Fincke formed Access in 2000 to develop, market and sell a portable automated external defibrillator ("the Access AED"). Between 2001 and 2005, the Investors invested approximately $20.8 million in the company through various loans and stock purchases. In the spring of 2001, Access received its first outside infusion of capital from Moriarty, Fincke's personal friend, in the amount of $50,000.  Moriarty made two subsequent investments of $1 million and $500,000 in July and December, 2001, respectively. Fincke also solicited an investment of $500,000 from Connolly, another personal acquaintance, in November, 2001.

   By the beginning of 2002, the Access AED had evolved considerably.  A provisional patent application in the United

States Patent and Trademark Office ("the PTO") had been filed to cover the Access AED technology.  Access had completed its required industry standard certification and was awaiting approval to market and sell its products in Europe.  The European market was responding positively to the Access AED even before formal approval and, in February, 2002, Access began signing distribution agreements with various European distributors.  In April, 2002, Moriarty and Connolly each invested an additional $300,000 in Access and the Access AED received approval for European sales and marketing.

Access continued to struggle, however, to pay past-due vendor accounts and to secure the raw materials necessary to manufacture the Access AED and thus solicited further capital investment.  Moriarty and Connolly made additional investments in the company in May and June, 2002.  Also around that time, Connolly solicited an investment in Access from Radley, his personal friend.  After meeting with Fincke, Radley invested $2 million in Access in June, 2002.

In July, 2002, before Access had obtained FDA approval to market and sell its defibrillator in the United States, Fincke received a letter from an attorney representing Philips Electronics ("Philips").  The letter claimed, based on Philip's investigation, that the soon-to-be-released Access AED infringed on at least one of nine patents owned by Philips.  Fincke

testified that he immediately forwarded the letter to corporate counsel, Michael Elefante ("Elefante"), who in turn forwarded it to Access's patent counsel, Mark Pandiscio ("Pandiscio"). Pandiscio responded to Philips in September, 2002, requesting clarification of the specific patents and claims alleged to be infringed and proposed licensing terms.

Philips did not respond until February, 2003. In the meantime, Fincke reviewed the patents himself and concluded there were no serious infringement issues. Pandiscio testified before the Bankruptcy Court that Fincke never asked him for a formal opinion as to whether the Access AED infringed any of Philips' listed patents or any other patents but recalled that he had discussed changing the label with Fincke and a mechanical designer.

Access received FDA approval to market and sell the Access AED in the United States in August, 2002. On August 30, 2002, Pandiscio filed with the PTO both a Non-Provisional Patent Application for the Access AED and an International Patent Application covering the Access AED technology. Shortly thereafter, Access began to sell its products in Europe.

Almost immediately, working capital constraints at Access began taking a toll. In order to obtain additional investments, Fincke, together with Access's management team and Elefante, prepared an investor letter and a business plan dated October,

2002 ("the October, 2002 business plan").  That business plan
detailed various aspects the company's business, past performance
and predicted performance.  Fincke did not prepare the entire
plan but contributed to its content and approved it prior to
dissemination.

The October, 2002 business plan contained, in pertinent
part, sections titled "Risk Factors" and "Litigation" both of
which disclosed a patent-infringement lawsuit brought against
Access by Cardiac Sciences but did not disclose the receipt of
the letter from Philips.  The plan stated:

> Many U.S. and foreign patents have been issued to
> Access's competitors with respect to AED's and their
> constituent components.  Access has been advised by its
> patent counsel that its product does not infringe any
> patents known to him.  However, there can be no assurance
> that that opinion is correct in all respects.

Each of the then-current investors, Connolly, Moriarty and
Radley, received a copy of the plan.  Zimmel, a potential
investor introduced to Access by a company manager, also received
a copy of the October, 2002 business plan shortly after it was
issued.  After a meeting with Fincke, Zimmel contributed $2
million to the company in three tranches: a $1 million stock
purchase in October, 2002, a $500,000 stock purchase in November,
2002, and a $500,000 loan in December, 2002.

Notwithstanding those investments, the company continued to
struggle.  In March, 2003, Moriarty invested an additional
$250,000 and Fincke, along with Elefante, began negotiations with

the Investors to secure additional financing for the company.  In
connection with those negotiations, the Investors received a new
document entitled "Access CardioSystems Company Overview" ("the
Company Overview").  In an email to the Investors, Fincke
outlined several financing options (including financing from
other sources), and the Investors responded with a proposal to
commit an additional $2 million to Access contingent upon changes
in governance and conversion of some of the Investors'
outstanding debt into equity.  Various email exchanges ensued
between Elefante, Fincke and the Investors, as confusion arose
regarding the terms of the additional financing.  After some
discordant correspondence regarding the Investors' insistence on
conversion of debt to equity and Fincke's initial reluctance to
accept the Investors' proposed terms, a consensus was ultimately
reached.

The additional financing from the Investors closed on April
25, 2003 ("the April, 2003 Transaction").  Pursuant to that
transaction, a significant proportion of the Investors' original
loans was converted into Access stock, and the Investors
purchased additional stock.  Fincke thus ceded his majority
ownership of Access to the Investors. Coincident with the April,
2003 transaction, a formal Board of Directors was constituted
comprised of Radley, Moriarty, Zimmel and Fincke.

In November, 2003, the Board voted to remove Fincke from his

position as president and CEO due to his perceived mismanagement of the company and offered him the position of Chief Technology Officer and non-executive Chairman of the Board.  Fincke rejected the Board's offer and left the company in January, 2004.  Shortly thereafter, Access exercised its right under its stockholder agreement with Fincke to repurchase all of Fincke's stock in Access for one dollar.

### B.    Legal Proceedings

In June, 2004, several months after leaving the company, Fincke asserted that he owned the intellectual property related to the Access AED ("the AED intellectual property").  The plaintiff-appellants responded by filing a lawsuit in Massachusetts Superior Court seeking a declaratory judgment that the company owned the AED intellectual property and asserting claims against Fincke for breach of fiduciary duty, fraud, negligent misrepresentation and securities fraud.  Fincke counterclaimed for a declaratory judgment of ownership and invalidity of the repurchase of his Access stock.  He sought damages for breach of fiduciary duty, breach of contract, promissory estoppel and wrongful discharge.

While the state court suit was pending, substantially all of the Access AEDs were recalled, forcing Access to file for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code ("the Code") in February, 2005.  Fincke

subsequently removed the pending state court action, via this
Court, to the United States Bankruptcy Court for the District of
Massachusetts.

In March, 2006, after consideration of cross-motions for
summary judgment, the Bankruptcy Court held that Access
rightfully owned the AED intellectual property and ordered Fincke
to assign any rights he held in that property to the company.
See Access I, 340 B.R. at 149-51.

Thereafter, the plaintiff-appellants filed a Third Amended
Complaint against Fincke alleging, inter alia, securities fraud,
fraud, negligent misrepresentation and breach of fiduciary duty.
The Bankruptcy Court bifurcated the action and conducted separate
trials on the issues of liability and damages.  In the liability
phase, the Bankruptcy Court presided over a nine-day trial during
which 13 witnesses testified and over 200 exhibits were admitted
into evidence.  Thereafter, the Bankruptcy Court entered a
lengthy and comprehensive decision ruling that Fincke was liable
to the plaintiff-appellants for fraud, breach of loyalty,
negligent misrepresentation and securities fraud.

Specifically, with respect to securities fraud, the
Bankruptcy Court held that Fincke made a material misstatement
regarding Access's intellectual property in his October, 2002
business plan by stating that Access had been advised by patent
counsel that its AED patent infringed on no other patent known to

that counsel.  See Access II, 404 B.R. at 666.

Following the decision on liability, the plaintiff-appellants moved for summary judgment as to damages under Section 410(a)(2).  They argued that, given the Court's determination on Fincke's liability under Section 410(a)(2), they were entitled to rescind all of their financial transactions with the company and recover their entire investment, plus interest, attorneys fees and costs.  The Bankruptcy Court denied the motion, determining that 1) rescission was not available because the Investors no longer owned the securities underlying the Section 410(a)(2) claim and 2) there was a genuine issue of material fact as to whether Fincke's sales of securities were "by means of" the misrepresentation in the October, 2002 business plan.  Access III, 438 B.R. at 24-25.

Accordingly, an evidentiary hearing was held on the question of damages in April, 2011, at which the Investors and Fincke testified.  Following that hearing, Fincke moved for reconsideration of the determination with respect to his liability under Section 410(a)(2).

In October, 2011, the Bankruptcy Court entered an order in which it denied Fincke's motion for reconsideration and determined, inter alia, that Fincke was liable for $1.5 million in damages plus interest and costs.  See Access IV, 460 B.R. at 83-84.  Specifically, the Bankruptcy Court found that, of the

$20.8 million in capital contributions made by the plaintiff-appellants, only Zimmel's purchases of $1 million and $500,000 in Access stock in October and November, 2002, respectively, were "by means of" Fincke's material misrepresentation.  <u>Id.</u> at 82-83. It also concluded that the plaintiff-investors had waived their claim for attorneys fees because no evidence relevant thereto had been presented at the evidentiary hearing.  <u>Id.</u> at 84 n.26.

In November, 2011, Fincke filed a notice of appeal with this Court.  The plaintiff-appellants filed a separate notice of appeal and supporting brief in December, 2011.  Shortly thereafter, the Court allowed a joint motion to consolidate the appeals.  In January, 2012, Fincke filed a brief in support of his appeal and responding to the plaintiff-appellants brief, to which the plaintiff-appellants, in turn, have replied.

## II.  <u>**Analysis**</u>

Fincke appeals from the finding of liability against him under Section 410(a)(2), and both sides appeal from the damages award albeit, of course, for different reasons.  Fincke asserts that, even if he is liable for a material misstatement in the October, 2002 business plan, the Bankruptcy Court erred in determining that any investments were made "by means of" that statement.  The plaintiff-appellants, on the other hand, contend that the Bankruptcy Judge erred by failing to award damages, either upon summary judgment or following the evidentiary

hearing, equal to their entire investment in the venture,
approximately $20.8 million.

### A.    Standard of Review

A federal statute vests in the United States District Courts
jurisdiction to hear appeals from interlocutory orders and
decrees of bankruptcy judges.  See 28 U.S.C. § 158.  In reviewing
an appeal from an order of a bankruptcy court, a district court
reviews de novo "[c]onclusions of law and legal significance
accorded to facts".  In re Chestnut Hill Mortg. Corp., 158 B.R.
547, 549 (D. Mass. 1993).  The court must, however, accept the
bankruptcy judge's findings of fact unless a review of the record
demonstrates that they are "clearly erroneous."  Id.

### B.    Fincke's liability under Section 410(a)(2)

Fincke contends that the Bankruptcy Court abused its
discretion in finding that his statement in the October, 2002
business plan that "Access has been advised by its patent counsel
that its product does not infringe any patents known to him...."
constituted a material, false statement which renders him liable
under § 410(a)(2).  He contends that the Bankruptcy Court's
conclusion was based on the erroneous assumption that Fincke had
represented, and the Investors had reasonably relied on his
representation, that he was referring to a "formal" opinion
provided by his patent counsel.  Fincke asserts that the
statement itself does not refer, implicitly or explicitly, to any

"formal" legal opinion and that none of the Investors understood

him to have made such a representation.  Instead, Fincke states,

it was clear to all involved that he had simply been told by

counsel that the patent did not infringe.

Fincke raised the same argument in his motion for the

Bankruptcy Court to reconsider its determination of liability.

When denying that motion, the Bankruptcy Court stated that

although it had referred to a legal opinion "formally given", the

context of its ruling makes apparent that it determined, based

upon testimony given at the liability trial, that Fincke's

attorney "had given no opinion, formal or otherwise, to the

effect that Access's product infringed no patent known to him."

Access IV, 460 B.R. at 75.  The Bankruptcy Court declined to

credit Fincke's assertion that he had received such legal advice.

Id.  Furthermore, the court added,

> [t]o the extent the Investors' testimony during the
> damages trial regarding their understanding that such
> advice referred to an informal, rather than formal,
> opinion differs from their testimony adduced during the
> liability trial, any such discrepancy is irrelevant.  The
> Court's ruling on liability under § 410(a)(2) was founded
> in an objective analysis of the truth and materiality of
> the statement, as the [SJC] has directed.

Id. at 75-76 (citing Marram, 809 N.E.2d at 1030).

Thus, Fincke's averment of error misstates the Bankruptcy

Court's reasons for finding the pertinent statement to be false.

The Bankruptcy Court reasonably determined, based upon the

evidence presented at trial, that no legal opinion had been provided to Fincke and that Fincke's representation was not otherwise credible.  Thus, Fincke's argument is without merit and the Bankruptcy Court's determination with respect to his liability under Section 410(a)(2) will not be disturbed.

### C.    Damages Award Under Section 410(a)(2)

Section 410(a)(2) imposes civil liability on any person who "offers or sells a security by means of any untrue statement of a material fact...."  M.G.L. c. 110A, § 410(a)(2).  The Massachusetts Legislature has directed courts to interpret that statute in coordination with the federal Securities Act of 1933. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 50-51 (2004).

To prevail on a claim under Section 410(a)(2), a plaintiff must establish that 1) the defendant "offers or sells a security", 2) in Massachusetts, 3) by making "any untrue statement of material fact" or by omitting to state a material fact, 4) the plaintiff did not know of the untruth or omission and 5) the defendant knew, or "in the exercise of reasonable care [would] have known," of the untruth or omission.  Id. at 52.  The defrauded purchaser need not prove scienter, negligence or reliance, id. at 53, and, if he has disposed of the security, is "entitled to sue for damages in the amount he would have recovered upon a tender less the value he received upon

disposition." <u>Cabot Corp.</u> v. <u>Baddour</u>, 394 Mass. 720, 724 (1985).
Contract damages, punitive damages, multiple damages and
injunctive relief are not available. <u>Id.</u>; <u>see also</u> <u>Marram</u>, 442
Mass. at 55.

Here, upon determining that Fincke was liable under Section
410(a)(2) for his material misstatement in the October, 2002
business plan, the Bankruptcy Court set out to determine the
damages, if any, to which the plaintiff-appellants were entitled.
It first rejected the plaintiff-appellants' contention at the
summary judgment stage that the very fact of a misstatement
entitled them to recover the full amount of their pre-petition
investments.  The Court stated that while the Investors need not
demonstrate reliance or show that Fincke's misstatement caused
any loss, they nevertheless must prove that one or more sales of
securities were made "by means of" that misstatement.  It
concluded that

> because this indubitably material question of fact —
> i.e., which transaction or transactions, if any, involved
> the sale of securities to the Investors "by means of"
> Fincke's misstatement — remains in dispute, the request
> for summary judgment must be denied.

<u>Access III</u>, 438 B.R. 16, 24-25.

After a hearing on damages, the Bankruptcy Court determined
that only Zimmel's purchases of $1.5 million in Access stock in
October and November, 2002 were "by means of" Fincke's material
misrepresentation.  Although the Investors all testified that

they relied on that misstatement for every one of their investments, the Bankruptcy Court found that testimony not to be credible.  It evaluated the Investors' demeanor while testifying and the substance of their testimony.  It noted that their answers appeared mechanistic and contrived and that their direct testimony was contradicted in certain key respects upon cross-examination.  The Court also found significant the Investors' "shifting focus from the allegations in the Complaint and testimony during liability trial to the damages trial." For example, the Investors initially focused on perceived misrepresentations and omissions in the 2003 Company Overview but then, once those claims were rejected, asserted that the October, 2002 business plan actually enticed them to make their investments.

Having found the allegations of reliance not to be credible, the Bankruptcy Court turned to an objective analysis of the relationship of the various investments, if any, to the October, 2002 business plan.  Even though Zimmel's testimony of reliance was not credible, the court noted that his purchases of stock in October and November, 2002 were the only sales of securities made shortly after the October, 2002 business plan had been distributed.  The Bankruptcy Judge concluded that

> because Zimmel need not demonstrate actual reliance on the misstatement, the use of the Business Plan to solicit that sale of stock allows Zimmel to recover damages under § 410(a)(2) for that particular transaction.

No further sales of securities transpired until the April, 2003
Transaction.  The Bankruptcy Court deemed those sales not to have
been made "by means of" the October, 2002 business plan
but rather

> through the dissemination of a new company document – the
> Company Overview – and as the result of extensive
> negotiations between Fincke, Elefante, and the Investors
> in light of Access's dire financial situation, the need
> for additional working capital, and the desirability of
> a change in corporate structure.  There was no evidence,
> apart from the Investors' self-serving and perfunctory
> testimony, that the Business Plan played any role in the
> solicitation of those additional investments.

Thus, the Bankruptcy Judge concluded that investments made
during April, 2003 were not recoverable pursuant to § 410(a)(2).

### 1.   Plaintiff-Appellants Appeal

The plaintiff-appellants contend that the Bankruptcy Court
erred in 1) denying their motion for summary judgment on damages
and 2) awarding only $1.5 million after the hearing on damages.

The Court easily dispenses with the first argument.  The
plaintiffs argue that the denial of summary judgment was
"directly contrary to the redressive and preventative purposes of
Section § 410(a)(2)" but ignore the fact that, under the
circumstances of this case, it was mandated by the unambiguous
language of that statute. As the plaintiff-appellants are aware,
Section 410(a)(2) does not impose strict liability on a seller of
securities for untrue statements or omissions and requires that a
sale be "by means of" a material misrepresentation.  See Marram,

442 Mass. at 52.  The Bankruptcy Court correctly denied summary judgment on damages because conflicting evidence existed as to which, if any, sales were made by means of such a statement.

The Court is similarly underwhelmed by the second argument which, incredibly, asks this Court to read the "by means of" requirement entirely out of the statute.  According to the plaintiff-appellants, the "by means of" requirement is "a very low threshold" which is satisfied by a mere showing that the buyer was aware of the material misrepresentation.  To support that proposition, they cite a decision of the Massachusetts Supreme Judicial Court ("the SJC") describing the separate requirement that a buyer be ignorant of the falsity of a misrepresentation.  See Marram, 442 Mass. at 53-54.  The SJC clarified that a buyer has no duty to investigate the accuracy of a statement and his sophistication is irrelevant.  Instead, a buyer need only show "lack of knowledge of a misleading statement or omission in order to prevail."  Id. at 53-54.

The buyer must also, of course, show that a particular sale was "by means of" an untrue statement of material fact.  As the Bankruptcy Court held, the plaintiff-appellants did not have to prove reliance or loss causation but did have to establish some link between a particular securities transaction and the material misstatement in order to meet that requirement.  See Access IV, 460 B.R. at 77-78; see also Sanders v. John Nuveen & Co., Inc.,

619 F.2d 1222, 1225 (7th Cir. 1980) (noting that the "by means
of" language in § 12(2) "requires some causal connection between
the misleading representation or omission and plaintiff's
purchase").  After concluding the Investors' reliance testimony
was not credible, the Bankruptcy Court reasonably found that only
the securities transactions made after dissemination of the
October, 2002 business report but before dissemination of the
Company Overview and negotiations about changes in the company's
governance, were "by means of" Fincke's material misstatement.
Its reasons for so holding are cogent and its determination will
be affirmed.

### 2.    Fincke's Appeal

     Fincke contends that, given its finding that Zimmel's
testimony on reliance was not credible, the Bankruptcy Court
erred in awarding any damages based upon an objective assessment
of whether the security sales were made "by means of" Fincke's
material misstatement.  He notes that the burden of proof is on
the plaintiff and argues that the court should not have engaged
in its own objective finding without supporting testimony.

     The Court disagrees.  The Bankruptcy Judge indeed discounted
Zimmel's testimony, but he properly relied on other pertinent
evidence concerning the solicitous purpose of the October, 2002
business plan and the proximity in time between its dissemination
and Zimmel's October and November, 2002 stock purchases.  That

evidence readily supports his conclusion that the requisite nexus
existed.

### D.   Denial of Attorneys Fees

Finally, the plaintiff-appellants contend that the
Bankruptcy Court committed reversible error by deeming the
request for attorneys fees to have been waived before judgment
had entered.  At the conclusion of its opinion on damages, the
Bankruptcy Court noted in a footnote that the plaintiff-
appellants waived their request for attorneys fees because "no
evidence relative to attorneys' fees was presented" at the
evidentiary hearing on damages.  Access IV, 460 B.R. at 84 n.26.

The Court agrees with the plaintiff-appellants that failure
to present evidence at the evidentiary hearing, before judgment
on damages had entered, did not constitute waiver of their demand
for attorneys fees.  The amount of damages awarded to plaintiffs
ordinarily will have a substantial bearing upon their entitlement
to attorneys fees.  See Hensley v. Eckerhart, 461 U.S. 424, 436
(1983).  Thus, requiring argument or the submission of evidence
on such fees prior to the resolution of the extent of Fincke's
liability was premature.  The Court will therefore remand the
case to the Bankruptcy Court for further proceedings on that
limited issue.

**ORDER**

In accordance with the foregoing, the decision of the Bankruptcy Court is, with respect to Fincke's liability under Section 410(a)(2) and the award of $1.5 million in damages, **AFFIRMED**, but is, with respect to the plaintiff-appellants' request for attorneys fees, **VACATED** and **REMANDED** to the Bankruptcy Court for further consideration.

**So ordered.**

/s/ Nathaniel M. Gorton

Nathaniel M. Gorton
United States District Judge

Dated September 26 , 2012